UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60116-CR-SCOLA/Snow

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

VAN LAWSON WILLIAMS,

        Defendant.

_____

### REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendant **Van Lawson Williams'** Motion to Suppress Statements, Confessions, and/or Admissions (DE 41), which was referred to United States Magistrate Judge, Lurana S. Snow, for Report and Recommendation. The Defendant is charged with harboring minors for purposes of commercial sex, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), (b)(2) and 1594(a). He seeks to suppress statements obtained from him during custodial interrogation on May 16, 2012 on the ground that he had invoked his right to remain silent on multiple occasions. The motion is fully briefed and an evidentiary hearing was held on August 30, 2012.

### I. EVIDENCE PRESENTED

The sole witness at the evidentiary hearing was FBI Special Agent Regino Chavez, who is assigned to the Miami Crimes Against Children Unit. He testified that on May 16, 2012, the Defendant was brought to the Fort Lauderdale Police Department (FLPD) headquarters. The Defendant was to be arrested on a federal arrest warrant, but he was not told about this by the FLPD officers who picked him up.

Agent Chavez related that the Defendant was placed in an interview room which doubled as a holding cell. The Defendant was secured in a seat with an ankle restraint, after which his handcuffs were removed. Agent Chavez explained that the use of an ankle restraint is FLPD

standard operating procedure. The Defendant entered the room at 9:42 p.m., and the video taped interview began at 9:49 p.m. The interview concluded at 10:29 p.m. Agent Chavez identified Government's Exhibit 1 as a DVD of the interview and Exhibit 2 as a draft transcript of the interview.[1]

Agent Chavez testified that he conducted the interrogation, with the assistance of FLPD Detective Brittenum. Neither officer had his weapon drawn, and neither displayed a weapon at any time during the interview. Detective Brittenum read to the Defendant, Government's Exhibit 3, an Advice of Rights Form. The Defendant initialed each of the rights, and he signed and dated the form.[2] Prior to being advised of his Miranda rights, the Defendant had the following exchange with Detective Brittenum:

> Detective Brittenum: . . . before we really talk to you we have to explain your rights to you and everything.
>
> The Defendant: I don't even wanna talk.
>
> Detective Brittenum: You don't want to know what's goin' on?
>
> The Defendant: I mean, I, I ain't didn't nothin', so [unintelligible]

(Government's Exhibit 3 at 2-3)

Agent Chavez stated that he informed the Defendant that he was being questioned in connection with a federal case, not the case on which the Defendant already had bonded out. No promises were made, although the Defendant was told that he might be able to help himself if he answered truthfully. No threats, pressure, coercion, physical force or deception was used by the officers. According to Agent Chavez, the interview was conducted in a respectful and business-like manner. He explained that the Defendant had been arrested approximately 25 times in the past, so this was not the first time Miranda rights had been read to him. The Defendant appeared to be aware

---

[1] The final version of the transcript, which will be utilized at trial, is not yet complete.

[2] The time reflected on the form is 9:48 p.m. Agent Chavez testified that the time stamp on the video tape is 3 minutes faster, showing 9:51 p.m.

of what was going on and, although the Defendant became defensive at times, he never said that he wanted to remain silent or otherwise invoked that right.

Agent Chavez acknowledged that approximately ½ hour into the interview, the Defendant stated something to the effect of, "If you're going to arrest me, I'm ready." However, after stating that, the Defendant continued to speak to the officers. The draft transcript reflects the exchange between Agent Chavez and the Defendant, as follows:

> The Defendant: . . . . Now I'm being honest wit ya'll so, and, and if ya'll gonna arrest me, I'm ready to go.
>
> Agent Chavez: [Unintelligible]
>
> The Defendant: I don't wanna say no more.
>
> Agent Chavez: Did you ever meet a girl named Eternity?
>
> The Defendant: Who?
>
> Agent Chavez: Eternity.
>
> The Defendant: Not that I know of.

Id. at 17-18.

Later in the interview, Agent Chavez asked for permission to look at the Defendant's phone. The Defendant agreed, but would sign a written consent form. The Defendant stated that he was "done," but according to the agent, the Defendant clearly was referring to signing the form. The draft transcript reflects the following:

> Agent Chavez: Would you give us permission to look through your phone?
>
> The Defendant: I don't care you can look through it.
>
> Agent Chavez: Would you be willing to sign something?
>
> The Defendant: Nah, you look through what you wanna look through, whatever you sign, you's like signing my life away. Matter of fact, I'm through, I'm through wit ya'll now, I'm through wit ya'll. Cause ya'll getting a little, okay, whatever, ya'll can lock me up now. I'm through wit ya'll. I've done been honest wit ya, if ya'll gonna lock me up, lock me up, I'm ready to go.

> Detective Brittenum: Well we're just trying to . . .
>
> The Defendant: No, I'm done sir.
>
> Detective Brittenum: . . . give you a chance to explain yourself.
>
> The Defendant: But I did, I did.  Explain myself, you have [unintelligible]
>
> Detective Brittenum: But you haven't told us the truth because you talked to Eternity on the phone.
>
> The Defendant: I talked to her?

Id. at 24-25.

      Agent Chavez testified that toward the conclusion of the interview, the Defendant said he wanted to "wrap it up."  The agent construed this to mean the Defendant just wanted the interrogation to be over.  Agent Chavez stated that although the Defendant had become defensive, the interview was not confrontational and voices were not raised.  The Defendant continued to provide information that Agent Chavez had not even requested.  The transcript reflects the discussion as follows:

> The Defendant: Okay, if you say I said that, I said that.  Now, I'm through with it, let's go.  Ya'll wrap it up.
>
> Detective Brittenum: What was that money for?
>
> The Defendant: I don't know.  Come on man, let's wrap it up cause ya'll trying to cause me now.
>
> Detective Brittenum: No, we're just trying . . .
>
> The Defendant: Ya'll lying and all that there.
>
> Detective Brittenum: . . . no we're giving you . . .
>
> The Defendant: [simultaneous conversation] lie to you. Okay [unintelligible]

Id. at 26-27.

      Agent Chavez testified that the Defendant never said that he wasn't talking anymore or not answering any more questions.  The statements the Defendant did make were not of the sort that would cause the agent to stop asking questions.

On cross examination, Agent Chavez stated that the Defendant had not been told that he was under arrest for a suspended license; in fact, prior to the interrogation, the Defendant was not told that he was under arrest at all. The agent explained that he did not hear the Defendant's statement at the beginning of the interview that he didn't want to talk, but pointed out that the Defendant said this before receiving the Miranda warnings. Agent Chavez conceded that during the last ten minutes of the interview, the Defendant repeatedly said that he did not want to talk to them anymore, and that the Defendant's demeanor had changed. Agent Chavez kept suggesting that this was the time the Defendant needed to talk to them.

Also on cross examination, Agent Chavez testified that the Defendant's most recent arrest had been for interfering with the custody of a minor. This charge had not been filed by the State and no longer was pending. The majority of the Defendant's other arrests had been for drugs.

At the conclusion of the hearing, counsel for the Government advised the Court that the Government would introduce into evidence any portion of the interview after the Agent Chavez asked the Defendant if he read or watched the news. Id. at 29.

## II. DISCUSSION

The Defendant argues that the entire interview should be suppressed because the he stated at the outset that he did not want to talk to Agent Chavez or Detective Brittenum. Alternatively, the Defendant argues that the interview should have ceased the first time he told the officers that he did not want to continue talking to them. The motion also asserts that the interview should be suppressed as the fruit of an unlawful arrest. However, no argument was presented on this issue at the hearing after the Government presented evidence that the Defendant had been arrested pursuant to a federal arrest warrant. Accordingly, the undersigned finds that the arrest of the Defendant was lawful, and his statement should not be suppressed as fruit of an unlawful arrest.

Turning to the issue of whether the Defendant invoked his right to remain silent, the law is clear that if, during custodial interrogation, a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."

<u>Miranda v. Arizona</u>, 384 U.S. 436, 473-74 (1966).  "Through the exercise of his option he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation."  <u>Michigan v. Mosley</u>, 423 U.S. 96, 103-104 (1975).  Law enforcement authorities must respect a suspect's exercise of this right in order to counteract "the coercive pressures of the custodial setting."  <u>Id.</u> at 104.

Recent cases have clarified that if a suspect wishes to invoke his or her right to remain silent, he or she must do so unamibguously.  <u>Berghuis v. Thompkins</u>, ___U.S. ___, 130 S.Ct. 2250, 2260 (2010).  "A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent."  <u>Coleman v. Singletary</u>, 30 F.3d 1420, 1424 (11th Cir. 1994), *cert. denied*, 514 U.S. 1086 (1995).  However, "[a]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."  <u>Smith v. Illinois</u>, 469 U.S. 91, 100 (1984).  Nonetheless, this Circuit has declined to adopt "a *per se* rule that a suspect's response of 'No' when asked if he wants to talk to a police officer means the officer cannot go forward with questioning."  <u>Medina v. Singletary</u>, 59 F.3d 1095, 1104-05 (1995).  The Court held that under certain circumstances, events preceding the answer "no" may render the word ambiguous.  <u>Id.</u> at 1105.

In the instant case, the undersigned finds that the Defendant's remark, "I don't even wanna talk," prior to being advised of his <u>Miranda</u> rights was not a clear, unambiguous assertion of his right to remain silent.  The undersigned notes that the Defendant immediately added that he meant that he hadn't done anything.  Also, at that point, the interrogation had not yet begun, and before any questions were posed to the Defendant, he signed a written waiver of his <u>Miranda</u> rights.

By contrast, when the Defendant told the officers that if they were going to arrest him, he was ready to go, followed by the statement "I don't wanna say no more"(Government's Exhibit 2 at 17), his wishes were clear and unequivocal.  The fact that the officers continued to question the Defendant and he continued to answer does not render his statement ambiguous.  <u>Smith</u>, 469 U.S.

6

at 99.  Moreover, the Defendant repeatedly told the officers that he wanted the interview to end, saying that he was "done," and asking them to "wrap it up."

The undersigned finds that any reasonable police officer in the circumstances would understand the words "I don't wanna say no more" as an assertion by the Defendant of his right to remain silent.  At that point, all questioning should have immediately ceased .  <u>Miranda</u>, 384 U.S. at 473. Accordingly, none of the Defendant's answers to questions posed after he made that assertion should be admitted at trial.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that Defendant **Van Lawson Williams'** Motion to Suppress Statements, Confessions, and/or Admissions (DE 41) be GRANTED IN PART, and that the portion of the Defendant's statement which follows the words "I don't wanna say no more" be suppressed.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Robert N. Scola, Jr., United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein.  <u>LoConte v. Dugger</u>, 847 F.2d 745 (11th Cir. 1988), <u>cert</u>. <u>denied</u>, 488 U.S. 958 (1988); <u>RTC v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 6th day of September, 2012.

/s/ Lurana S. Snow
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record